UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) P0574988 and |
| | ) P0574989 |
| ERIK NESTOR, | ) |
| | ) |
| Defendant | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On February 6, 2007, I held a bench trial on two petty offenses brought on two separate violations bureau citations, one alleging operating a motor vehicle in Acadia Park with a BAC in excess of 0.08 and the other alleging operating a motor vehicle in Acadia Park while incapable of safely operating the same. After the Government rested I entered oral orders on the defendant's motion to suppress, denying the same, and on the defendant's motion for judgment of acquittal on the *per se* test result violation, granting the same. The reasons for those orders are stated on the record. I also denied the motion for judgment of acquittal on the second violation. The defendant presented evidence and then rested finally. I took the matter under advisement and these are my findings of fact and conclusions of law as they relate to Violation No. PO574989, incapable of safely operating a motor vehicle because of alcohol consumption.

### FINDINGS OF FACT

1.  Darren D. Belskis was employed as a park ranger at Acadia National Park on October 6, 2006, the Friday of Columbus Day Weekend.

2. Between approximately 9:30-9:45 p.m. he was patrolling Blackwoods Campground on foot. It was a busy weekend with many people camping in the park and some noise and parties attendant to that activity.

3. Belskis observed the defendant, Eric Nestor, and his girlfriend, Toni Fellela, sitting quietly at a picnic table in space number 93, drinking a beer. Camping space number 93 was relatively dark, there were no nearby campers and nothing untoward appeared to be occurring at the campsite.

4. Nestor and Fellela had arrived in Maine from Rhode Island about 3:00 p.m. that afternoon, had settled into their campsite, gone to a local grocery store and purchased provisions, including a six-pack of pumpkin spice beer and a pint of Myers Rum, prepared a camp dinner of flank steak wrapped in bacon, potato salad, potato chips, and had eaten their dinner.

5. Nestor and Fellela each had two beers and two rum drinks with approximately "two fingers" of rum in them between approximately 6:00 p.m. and 9:45 p.m. The entire pint of rum had not been consumed and was stored away in the cooler by the time these events arose.

6. While watching from the woods, Belskis saw Nestor finish drinking a beer and he and Fellela got into Fellela's black 1998 Volkswagon Jetta. There was nothing unusual about the way Nestor walked to the vehicle or entered the driver's side of the car.

7. After a few seconds Nestor got out of the vehicle, walked back to the picnic table and picked up two unopened beer bottles from the picnic table and took them back to the car. Again, Nestor did not stumble or exhibit any unusual behavior.

8. The reason Nestor returned to the picnic table to get the two unopened beers was that Fellela told him to do so because she was worried they would be taken if left on the table in plain view. There is no evidence that Nestor intended to drink the beers while driving to a gas station

in Bar Harbor, the reason he was leaving the campground. Although Ranger Belskis may have assumed and articulated to the occupants that the two beers were "for the road," the evidence does not support that assumption.

9. Nestor proceeded to back out of the gravel surface of the parking area onto the tarred, narrow (approximately 10 feet wide), one-way campground access road. As he backed out and maneuvered to face in the correct direction to exit the campground, the left rear wheel of the Jetta left the tarred pavement and went onto the verge of the road with the back bumper brushing some short (no higher than 2 feet) evergreen shrubs growing alongside the road. While the operation of the vehicle may not have been perfect, the operation was reasonable and safe.

10. Contrary to the police reports and the direct testimony of Ranger Belskis at trial, the Jetta neither backed into a ditch nor did it strike a small tree as those statements would be normally understood. Ranger Belskis's responses on cross-examination and the undisputed photographs provide the basis for finding 9.

11. After Nestor stopped the reverse motion of his vehicle and was about to pull forward to leave the campground, the ranger stepped up to the passenger side of the car with a flashlight and made contact with the occupants.

12. Ranger Belskis smelled the odor of intoxicating liquor coming from the vehicle and learned from Fellela, whose statement was agreed to by Nestor, that the two of them had been drinking a few beers.

13. After observing the defendant, Ranger Belskis ordered him to drive the car back into the parking space at the campsite. The defendant was capable of safely operating the motor vehicle in this fashion and pulled back into the space without incident.

14. Belskis asked Nestor to get out of the vehicle and he did so without incident.

15. Belskis had Nestor perform three field sobriety tests, a horizontal gaze nystagmus test, a walk and turn test and a one-legged stand test. Belskis has received training and properly administered each of these tests.

16. As a result of the tests Belskis formed the opinion that Nestor was under the influence of intoxicating liquors and placed him under arrest and transported him to the Bar Harbor Police Department. In Belskis's view, Nestor did not follow his instructions nor did he have the balance necessary to hold up one leg for 30 seconds without putting his foot down—on four separate occasions—before 15 seconds had elapsed.

17. The latter two tests are considered to be "divided attention" tests and part of what they measure and what Belskis considered is the defendant's ability to follow directions. In this case Nestor's girlfriend was visibly upset, described by a second a ranger at the scene as hysterical at some points, and she interjected herself between Belskis and Nestor at the crucial point when Belskis was giving instructions about how to complete the walk and turn test.

18. Nestor was taken to the Bar Harbor Police Department where he waited without incident for over 15 minutes. His demeanor during this wait period was appropriate, as revealed by the videotape that recorded everything he did and said during that wait period.

19. Nestor satisfactorily completed the breath test and obtained a test result of 0.10.

20. The park rangers transported Nestor first to the Hancock County Jail and then to the Penobscot County Jail, only to learn that both facilities were full and would not accept Nestor.

21. During the return ride to Bar Harbor Nestor relaxed and spoke more freely with the officers, visibly relieved that he was not going to spend the night in jail. Nothing Nestor did or said on the ride to and from the various jails was inappropriate, belligerent, or indicative of intoxication.

22. According to the Government's own expert witness, Robert Morgner, the 0.10 test is subject to a margin of error (most likely to weigh in favor of Nestor) that means his test result could be as low as 0.075 and as high as 0.125. According to Morgner, the latter is the statistically more likely one, but there is no way of assessing which might apply to Nestor except from the other extrinsic evidence of intoxication.

23. More significant than any test margin of error in this case is the fact that, according to the Government's expert, it would take between thirty minutes and one-hour for a man weighing between 180 and 200 pounds to absorb the alcohol into his bloodstream from the time he completed drinking a beer. One 12 ounce beer could represent approximately .02 increase in a person's blood alcohol level. According to the PO violation citation, Nestor weighs 190 pounds.

24. The Government's expert further testified that the test result obtained at 10:42 p.m. might or might not reflect the blood alcohol of a person who had been driving a car at 9:50 p.m. because there was no way to tell from a test result whether the defendant had absorbed all of the alcohol into his bloodstream approximately an hour earlier and was eliminating alcohol or still absorbing alcohol. Such a determination could only be made by looking to extrinsic evidence, such as the time of the last drink, the total alcohol consumed and the amount of food in the stomach.

CONCLUSIONS OF LAW

**1. The Meaning of the Breath Test Result**

In this case the breath test result is evidence that the defendant consumed intoxicating liquors and it roughly corroborates Fellela's testimony and Nestor's statement about the amount of alcohol consumed during the evening. The test result, according to the Morgner testimony

5

that a drink could roughly represent .02 percent of alcohol in the blood, could easily represent the results of two beers and two rum drinks with a higher alcohol content.  It is also clear from the Morgner testimony and the undisputed evidence concerning when the last beer was consumed, that the alcohol from that last drink had not yet been absorbed into defendant's bloodstream *at the time of the operation.*

Under Maine law, 29-A M.R.S.A. § 2432 (2), a blood alcohol level greater than 0.05% and less than 0.08% at the time of operation, the level I find based on the evidence applicable to the defendant, is considered relevant evidence for the factfinder to consider as to whether the person is under the influence of intoxicating liquors, even though the person is not guilty of the per se violation of operating in excess of 0.08.  The Government has not identified any corresponding regulation or statute under federal law, nor have I found any, that gives this court evidentiary guidance as to the meaning to attach to a test result less than 0.08 vis-à-vis the crucial factual finding required by this charge, i.e., that the defendant was operating under the influence to a degree that rendered him incapable of safely operating a motor vehicle in violation of 36 C.F.R. § 4.23 (a)(1).[1]  Even if the Maine statutory scheme were somehow imported into this charge, it would not provide any guidance on this crucial factual question.

---

[1] The C.F.R. is a bit confusing as to what evidentiary weight should be given to a lower than *per se* violation BAC at the time of operation because it provides that if the blood or breath test result *at the time of the testing* is below 0.08, this fact does not give rise to any "presumption" that the operator is or is not under the influence. 36 C.F.R. § 4.23 (d)(1).  The offense language, sub-section (a)(2), references a 0.08 BAC when *operating* the vehicle.  Consistent with the principle that the Government must prove each element of an offense beyond a reasonable doubt, I have always understood that a "presumption" in a criminal statute means that if one fact is proven, it is a permissible inference for the factfinder to conclude the other fact is so.  Thus I read the C.F.R. to suggest that if at the time of the test the defendant's blood alcohol level is below 0.08, it has no evidentiary significance for the factfinder at all in the absence of expert testimony explaining how a given blood alcohol level might impact ability to operate a vehicle.  In any event, that language has no applicability to these facts because *at the time of the testing* defendant's BAC was in excess of 0.08.  However, the C.F.R. gives no guidance as to the evidentiary relationship between any given test result and capability to safely operate a motor vehicle, the crucial element of this particular charge.

6

**2. The Applicable Charge**

Under Maine law if a person is effected in any way and to any extent by the alcohol they have consumed and they then operate a motor vehicle, they are guilty of operating under the influence. State v. Bean, 430 A.2d 1109 (Me. 1981). The C.F.R. violation charged in this case is an entirely different formulation. According to the Government's allegation it must prove that the defendant was incapable of safely operating a motor vehicle as a result of being under the influence of intoxicating liquor and/or drugs. It seems to me there are four basic ways that this allegation could be proven: (1) presumably the most common method, by evidence of unsafe operation of the vehicle coupled with evidence of consumption of alcohol and/or drugs; (2) by evidence of consumption of alcohol and behavior by the defendant of extreme intoxication, such as inability to walk or talk in a coherent fashion, which would allow a factfinder to draw the logical inference that the person lacked the basic motor skills necessary for safe operation; (3) by expert testimony about the significance of "test results," whether field sobriety tests or blood alcohol tests, and the correlation between those results and a person's ability to safely operate a motor vehicle[2]; and/or (4) by a statutory formulation that directed a factfinder as to what significance could be given to particular test results vis-à-vis safe operation of a motor vehicle.[3]

---

[2] I note that a lay person such as myself might infer that because the defendant had been drinking alcohol and had some difficulty following an object in smooth pursuit, walking heel to toe and holding up his foot, he was effected to some degree and however slightly by the alcohol he had consumed. I have indeed, as a state court judge in a prior life, found defendants guilty of the Maine violation based upon just such inferences. However, there is a line between drawing logical inferences from proven facts, and deciding a fact has been proven beyond a reasonable doubt based upon speculation. Absent strong evidence of unsafe operation or evidence of a very high degree of intoxication, I conclude I would be merely speculating about a defendant's ability to safely operate a motor vehicle based upon evidence he had consumed some quantity of alcohol below the per se amount and performed some field sobriety tests less than satisfactorily in a police officer's opinion. As the defendant's motion in limine pointed out, and the Government conceded prior to trial, the officer's opinion regarding a defendant's performance on a HGN test is admitted on the issue of probable cause and as circumstantial evidence of some impairment from the consumption of alcohol, not as evidence of the concentration of alcohol in the blood.

[3] Or a statutory formulation such as a *per se* violation that measures BAC at the time of operation or within two hours after driving. See, e.g., Colo. Rev. Stat. Ann. § 42-4-1301(2)(a), Colorado's *per se* provision. If the C.F.R. under consideration in this case had contained that formulation, the defendant would have been guilty of the *per se* violation.

7

In this case there is no evidence of unsafe operation, no evidence of extreme intoxication, no expert testimony regarding the significance of the test results vis-à-vis ability to safely operate as distinct from being influenced to some degree by alcohol, and no statutory guidance on this issue except for the *per se* violation of "in excess of .08" when operating, a charge that I have found to be unsupported by proof beyond a reasonable doubt on this evidence.

I am not alone in finding the language requiring the Government to prove that the alcohol consumed has rendered the defendant incapable of safe operation represents a higher burden of proof than Maine law would require. Indeed, apparently the Maine Legislature figured this out in 1919 when they amended Maine law to delete the requirement that the State prove the defendant was so far under the influence that the public was endangered thereby. State v. Mann, 143 Me. 305, 311, 61 A.2d 786, 789 (1948). Other states, and apparently the federal government, have taken a different approach to the elements of this offense.

Cases in Montana and Colorado are most instructive in understanding the differences among the varying meanings of "under the influence." In a 1973 case the Supreme Court of Colorado discussed the two-tier statutory scheme then in effect in Colorado.[4] The Court essentially concluded that under Colorado's statutory scheme the misdemeanor crime of "driving while ability impaired" (DWAI) was a lesser included offense of the misdemeanor crime of "driving while under the influence" (DUI). The offense with the higher penalty provision, DUI, was akin to the Colorado crime of driving while under the influence to a degree which renders the operator "incapable of safely operating a vehicle." The Supreme Court concluded that DUI required a higher degree of proof than DWAI which required only that the State prove a person

---

[4] I have not researched and do not claim to state the current Colorado law regarding the offense of operating under the influence. The current statutory scheme, referenced briefly in footnote 3 above, is complex. However, in the absence of federal law to the contrary, and I can find no federal case that extensively discusses this issue, it seems to me that the discussion of the meaning of identical language in this thirty-four year old case provides guidance for the meaning of the current federal C.F.R. language.

8

was effected to the "slightest degree" by the alcohol they had consumed.  See Thompson v. People, 181 Colo. 194, 510 P.2d 311 (Colo. 1973).

State v. McNally, 310 Mont. 396, 50 P.3d 1080 (Mont. 2002), provides some further guidance about the differing state standards associated with DUI charges.  Montana clearly rejects Maine's standard of impairment, the "slightest degree" of impairment.  The court in McNally also noted that Montana's Legislature in 1987 deleted the language "renders him incapable of safely driving a vehicle" and substituted therefore "a person's ability to safely operate a motor vehicle has been diminished," establishing some intermediate standard of proof greater than "to the slightest degree" and less than incapable of safe operation. Id. at 1084-1085.  Again, the language and reasoning is helpful in determining the standard of proof applicable to the present case given the language in the C.F.R.

### 3.  The Sufficiency of the Evidence

Based upon the findings of fact and the conclusions of law I have made, I conclude that the Government has failed to prove beyond a reasonable doubt that Eric Nestor operated a motor vehicle at a time when his consumption of alcohol rendered him incapable of safely operating the same.

### Conclusion

The clerk is directed to enter a finding of not guilty.

*So Ordered.*

Dated February 9, 2007                                        /s/ Margaret J. Kravchuk
                                                              U.S. Magistrate Judge